ROBERT J. KELLER, III

V.

COLLINS DENNY, III, ET AL.

Record No. 831869

January 16, 1987

Present: All the Justices

*Edward B. Lowry (John C. Lowe; Michie, Hamlett, Donato & Lowry; Lowe and Jacobs, Ltd.*, on briefs), for appellant.

*William D. Bayliss (James W. Morris, III; Paul S. Bliley, Jr.; Browder, Russell, Morris & Butcher, P.C.*, on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

This appeal presents a single question: at what time does the statute of limitations begin to run on a claim for damages caused by an attorney's alleged malpractice?

The facts pertinent to the foregoing question are essentially undisputed. Robert J. Keller, III (Keller), had been one of the organizers of Kel-Win Manufacturing Company, a corporation engaged in the manufacture and sale of plumbing fixtures. In the 1970's, Keller was the president of Kel-Win and was its largest stockholder. Soon after the corporation was formed, Keller engaged the Richmond law firm of Mays, Valentine, Davenport and Moore (Mays, Valentine) through its member, Collins Denny, III (Denny), to act as general counsel for Kel-Win and as personal counsel for Keller. Mays, Valentine performed all the varied legal services required by Kel-Win and by Keller from the early 1960's until November 1980, except for some specialized patent work.

In 1975, Keller asked Denny to negotiate and to draft a stock purchase agreement with Nibco, Inc., whereby Nibco would buy from Keller and the other stockholders in Kel-Win a majority of Kel-Win's stock. Keller informed Denny that a condition of the sale was to be an option for Keller and his associates to repurchase the shares from Nibco if Kel-Win should fail to achieve $5,000,000 in gross sales by 1977. Nibco agreed to such an option. In drafting the stock purchase agreement, however, Denny inadvertently adopted language vesting the repurchase rights in Kel-Win itself, rather than in Keller and the other former stockholders. That language left Keller unprotected because Kel-Win's board of directors would be controlled by Nibco. The agreement was executed on September 8, 1975, as drafted. Neither Denny nor Keller was then aware that the language of the agreement would leave Keller powerless to enforce the repurchase option if the $5,000,000 sales threshold were not met by 1977.

In November 1977, Keller and the other former Kel-Win stock-holders agreed with Nibco to amend the stock purchase agreement to extend the deadline for achievement of $5,000,000 in gross sales to December 1980. Kel-Win had not yet achieved that level of sales in 1977, but all parties desired that the agreement be continued and Kel-Win's prospects appeared favorable. Denny represented Keller and the other former stockholders in these negotiations and conducted a shareholders' meeting in his office to approve the amendment. The document amending the stock purchase agreement, however, was prepared by Nibco's counsel. It was executed November 7, 1977.

Although Denny did "piecemeal" work for Keller and for Kel-Win on matters unrelated to the stock purchase agreement during the late 1970's, his next involvement in the matter of the stock purchase by Nibco arose in May or June 1980, when Keller told him that Kel-Win would not reach the $5,000,000 goal that year. Denny then reviewed the 1975 agreement and discovered that Keller and his associates would be powerless to exercise the option to repurchase the majority shares in Kel-Win.

Denny discussed the matter with counsel for Nibco, who had been unaware of the defect in the 1975 agreement, and who agreed that, as drafted, it failed to reflect the agreement of the parties. In November 1980, Denny advised Keller of the fact that he and his associates would be unable to exercise the repurchase option. Denny recommended that Keller bring either a chancery suit for reformation of the agreement or a shareholder's derivative suit to resolve the problem. Because Denny would be required to testify as a witness in such a suit, he recommended that Keller obtain other counsel. Keller terminated his relationship with Mays, Valentine on November 26, 1980.

Keller brought this action on April 2, 1982, against Denny and against the partners of Mays, Valentine to recover damages for alleged malpractice. The defendants pleaded the statute of limitations. The court took evidence on the plea. The parties agreed that the applicable limitation period was three years, pursuant to our holding in *Oleyar v. Kerr, Trustee*, 217 Va. 88, 225 S.E.2d 398 (1976). The issue in dispute was the time when the statute began to run. In a written opinion, the court reviewed the authorities and concluded that the statute began to run in 1975, when the defective agreement was drafted and executed. We granted Keller an

appeal from the final order which sustained the plea of the statute of limitations.

Code § 8.01-230, effective October 1, 1977, provides:

> In every action for which a limitation period is prescribed, the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person, when the breach of contract or duty occurs in the case of damage to property and not when the resulting damage is discovered, except where the relief sought is solely equitable or where otherwise provided under § 8.01-233, subsection C of § 8.01-245, §§ 8.01-249, 8.01-250 or other statute.

In *First Virginia Bank-Colonial* v. *Baker*, 225 Va. 72, 301 S.E.2d 8 (1983), on facts occurring prior to the effective date of Code § 8.01-230, we held that in a property damage case, the applicable limitation period did not begin to run until damage occurred, even though the wrongful act or breach of duty giving rise to the damage had occurred at an earlier time. In *Harbour Gate Owners' Ass'n.* v. *Berg*, 232 Va. 98, 107, 348 S.E.2d 252, 258 (1986), we held that § 8.01-230 had materially changed the rule in *Baker*, and caused the limitation period, in property damage cases arising after October 1, 1977, to begin to run on the date "the breach of contract or duty occurs," even though no property rights had yet been injured.

On appeal, Denny argues that Code § 8.01-230 is inapplicable because Keller's right of action accrued in 1975, before the statute's effective date. Keller argues that his right of action did not accrue until December 1980, when the deadline passed for the achievement of the $5,000,000 sales goal, and that if Code § 8.01-230 operates to bar his remedy before his right accrued, it is unconstitutional. Alternatively, he argues that he is entitled to the benefit of the "continuing relationship" or "continuing negligence" rules, which would cause the statute to begin to run only from the end of a course of allegedly negligent conduct. The end of Denny's work with regard to the Kel-Win—Nibco transaction, Keller contends, came only in 1980. Therefore, Keller says, Denny's "breach of contract or duty," triggering the running of the statute of limitations under Code § 8.01-230, occurred within the three-year period preceding the filing of this action.

■ In *Harbour Gate*, we were not called upon to decide the constitutionality of Code § 8.01-230 as applied to property damage cases. It is a well-recognized principle of appellate review that constitutional questions should not be decided if the record permits final disposition of a cause on non-constitutional grounds. "One of the most firmly established doctrines in the field of constitutional law is that a court will pass upon the constitutionality of a statute only when it is necessary to the determination of the merits of the case." *Bissell* v. *Commonwealth*, 199 Va. 397, 400, 100 S.E.2d 1, 3 (1957). Because of the view we take of this case, we do not now reach the constitutional question.

■ Since the beginning of this century, our cases have adhered to the general proposition that "where there is an undertaking or agency which requires a continuation of services, the statute of limitations does not begin to run . . . until the termination of the undertaking or agency." *Riverview Land Co.* v. *Dance*, 98 Va. 239, 244, 35 S.E. 720, 722 (1900). This rule has been applied to varying circumstances in which a principal has entrusted an agent with a continuing series of transactions, or a single but long-protracted transaction. *See, e.g., Wilson* v. *Miller*, 104 Va. 446, 51 S.E. 837 (1905) (attorney-in-fact appointed to sell real estate, collect proceeds, and collect accounts receivable); *Beale* v. *Moore*, 183 Va. 519, 32 S.E.2d 696 (1945) (attorney employed to collect debts owed to bank in receivership); *McCormick* v. *Romans and Gunn*, 214 Va. 144, 198 S.E.2d 651 (1973) (attorney employed to develop subdivision, sell lots and collect proceeds); *Wood* v. *Carwile*, 231 Va. 320, 343 S.E.2d 346 (1986) (attorneys employed to handle many interrelated real estate financing transactions). In *Wilson* and *McCormick*, the rule was applied to the claim of a principal against an agent for the agent's misappropriation of funds. In *Beale* and *Wood*, the rule was applied to the reverse situation, where the agent sued the principal for compensation. None of the foregoing cases required a distinction between an "undertaking" and an "agency" in the context of professional malpractice.

On appeal, Keller argues that a similar "continuing agency" rule should apply to a claim for legal malpractice alleged to have occurred within a continuing attorney-client relationship. Keller, citing *McCormick* as authority, contends that such a rule is easy to apply and is fair to a client who, because of long reliance on his

attorney's professional skill, is in a difficult position to discover that his attorney has erred.

Denny responds that some attorney-client relationships last a lifetime, and that those involving corporate clients may span generations. He argues that to require a law firm to maintain continuous readiness to defend itself against malpractice claims dating back to the beginning of such a relationship would impose the very burden the statute of limitations was designed to alleviate. Moreover, he points out, we have treated medical malpractice claims differently.

In *Farley* v. *Goode*, 219 Va. 969, 252 S.E.2d 594 (1979), we considered a long-standing professional relationship in the context of an action for dental malpractice. Characterizing the result of our holding as a "continuing treatment rule," we noted that there was an important distinction between the "continuity of a general physician-patient relationship" and "diagnosis and treatment 'for the same or related illnesses or injuries, continuing after the alleged acts of malpractice . . . .' " *Id.* at 979, 252 S.E.2d at 600 (quoting *Borgia* v. *City of New York*, 12 N.Y.2d 151, 157, 187 N.E.2d 777, 779 (1962)). We recognized, on one hand, the injustice of requiring a defendant physician to be in readiness to defend himself against malpractice claims dating from the beginning of a long physician-patient relationship,* and on the other hand, the injustice of penalizing a plaintiff patient who, under long-continued treatment, had the right to assume that due care and skill would be exercised. Embracing neither of these extremes, we held, in the physician-patient context, that "the statute of limitations commences to run when the improper course of examination, and treatment if any, *for the particular malady* terminates." *Id.* at 976, 252 S.E.2d at 599 (emphasis added).

The reasons which supported the application of the continuing treatment rule to the relationship of physician and patient apply with equal force to the relationship of attorney and client. Ac-

---

* This would be the result if we should hold that this case is governed by our recent decision in *Wood* v. *Carwile*, 231 Va. 320, 343 S.E.2d 346 (1986), in which a "continuing agency" rule was applied. *Wood* was an action by attorneys against a former client to recover fees, rather than a malpractice case. The policy considerations which support the "continuing agency" rule in a collection case have little validity when applied to a malpractice case. For example, a stale malpractice claim imposes not only the usual burden on the defendant to marshal evidence for his defense, but may confront the trier of fact with insuperable difficulties in weighing expert opinions relating to a professional standard which antedates the experience of the experts.

cordingly, we hold that when malpractice is claimed to have occurred during the representation of a client by an attorney with respect to a particular undertaking or transaction, the breach of contract or duty occurs and the statute of limitations begins to run when the attorney's services rendered in connection with that particular undertaking or transaction have terminated, notwithstanding the continuation of a general attorney-client relationship, and irrespective of the attorney's work on other undertakings or transactions for the same client.

This holding is consistent with the view we took in *McCormick* v. *Romans and Gunn.* There, attorneys were employed to develop a subdivision, pay its expenses, sell the lots, and collect the proceeds of sale. That work lasted nearly four years. At the end of that period, an audit revealed a shortage in the attorneys' accounts and the client brought suit. We said:

> "As a general rule, the statute of limitations begins to run against a cause of action at the time of its accrual. But where there is an undertaking which requires a continuation of services, the statute of limitations does not begin to run until the termination of the *undertaking. Wilson* v. *Miller,* 104 Va. 446, 448, 51 S.E. 837, 838 (1905). This special rule is applicable to a continuing agreement between attorney and client. *Beale* v. *Moore,* 183 Va. 519, 525-26, 32 S.E.2d 696, 698-99 (1945). Indeed, it is particularly appropriate to an attorney-client agreement in view of the confidence and trust inherent in that relationship. *Keaton Co.* v. *Kolby,* 27 Ohio St.2d 234, 237, 271 N.E.2d 772, 774 (1971)."

*Id.,* 214 Va. at 148-149, 198 S.E.2d at 654-655 (emphasis added).

In *McCormick,* the "undertaking" was the complex task of developing a subdivision for a client. The statute of limitations began to run when that task was completed. The running of the statute was not dependent upon the termination of the attorney-client relationship, although that may have occurred at nearly the same time.

We note here, as we did in *Farley,* that the rule discussed above is applicable only when a continuous or recurring course of professional services relating to a particular undertaking is shown to have taken place over a period of time. 219 Va. at 980, 252 S.E.2d at 601. When the alleged malpractice consists of a single,

isolated act, Code § 8.01-230 now dictates that the statute of limitations begins to run when that act is performed, regardless of the time of its discovery.

Applying the foregoing principles to the case before us, we conclude that the "undertaking" entrusted to the attorney, upon which the client bases his claim of negligence, required a continuing or recurring course of professional services over a period of time. The attorney's responsibilities with respect to the Kel-Win—Nibco transaction were not, as the trial court held, fully discharged when the stock purchase agreement was drafted in 1975. Instead, the attorney was required to give recurring attention to the matter until 1980. He was called upon to review the matter twice, in 1977 and again in 1980, in light of altered circumstances, and to advise his client with regard to the most advantageous course of action to take. He had a duty to keep his client advised of potential advantages and pitfalls in the matter. That duty did not arise merely upon the client's specific request for advice, but was also inherent in the continuing nature of Keller's relationship with Mays, Valentine during the time that the construction and enforcement of Keller's contractual rights with respect to the Kel-Win—Nibco transaction remained entrusted to the law firm. *See Musselman* v. *Willoughby Corp.*, 230 Va. 337, 343-44, 337 S.E.2d 724, 728 (1985).

Applying an analogy of the "continuing treatment" rule we adopted in *Farley* to the attorney-client relationship in this case, we conclude that the particular undertaking of the attorney continued until November 1980, when Denny rendered his last professional services with regard to the Kel-Win—Nibco transaction by advising Keller of the most advantageous course to take to resolve the stock repurchase problem. The statute of limitations then began to run on Keller's claim of malpractice arising out of the attorney's services relating to that undertaking. Because this action was instituted in April 1982, the trial court erred in holding it barred by the three-year statute of limitations.

Accordingly, we will reverse the judgment and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*

STEPHENSON, J., concurring.

I concur with the majority's result, but I do not agree with its rationale. The majority holds that, under the continuing relationship rule, Keller's cause of action accrued in November 1980 when Denny rendered his last professional services in the Kel-Win—Nibco stock repurchase matter. At that time, however, Keller had not been damaged.

Damage is an essential element of a cause of action. Without some injury or damage, however slight, a cause of action cannot accrue. *Stone v. Ethan Allen, Inc.*, 232 Va. 365, 369, 350 S.E.2d 629, 632 (1986); *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 82, 301 S.E.2d 8, 13-14 (1983); *Locke v. Johns-Manville Corp.*, 221 Va. 951, 957, 275 S.E.2d 900, 904 (1981); *Caudill v. Wise Rambler*, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969).

In the present case, no damage whatsoever occurred until December 1980, the deadline for achieving $5,000,000 in gross sales. Although Denny breached his duty to Keller in 1975, Keller's cause of action and right of action did not accrue until the expiration of the option in December 1980. Thus, the statute of limitations began to run at that time.

This analysis, however, may conflict with Code § 8.01-230, which provides that a cause of action accrues and the statute of limitations begins to run "when the breach of contract or duty occurs in the case of damage to property . . . ." To the extent that Code § 8.01-230 bars a cause of action before *any* damage has occurred, its application would deprive a person of property without due process of law in violation of the Federal and Virginia constitutions. U.S. Const. amend. XIV, § 1; Va. Const. art. I, § 11. *See Potomac Hospital Corp. v. Dillon*, 229 Va. 355, 360, 329 S.E.2d 41, 44-45 (1985); *Shiflet v. Eller*, 228 Va. 115, 121, 319 S.E.2d 750, 754 (1984). *See also Marshall v. Bird*, 230 Va. 89, 93, 334 S.E.2d 573, 575 (1985).