DONALD C. G. NELSON, ET AL., ETC.

V.

COMMONWEALTH OF VIRGINIA, ET AL.

Record No. 841717

April 22, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Whiting, JJ.,
and Harrison, Retired Justice

*Michael W. Smith (Mary T. Metil; Jeanne M. Forneris; Christian, Barton, Epps, Brent & Chappell; Hart and Bruner, P.A.*, on briefs), for appellants.
*Karen A. Gould (William G. Broaddus, Attorney General; James T. Moore, III, Senior Assistant Attorney General; Crews, Hancock and Dunn*, on brief), for appellees.
*Amicus Curiae:* Virginia Society of Architects/AIA (Arthur T. Kornblut; Joseph M. Spivey, III; Kornblut & Sokolove; Hunton & Williams, on brief), for appellants.

POFF, J., delivered the opinion of the Court.

In this appeal, the architects of a state-owned project challenge a judgment confirming a jury's finding of liability for breach of their construction contract administration duties. The Commonwealth of Virginia contests that portion of the verdict awarding the architects damages for unpaid fees.

## I. FACTS

Most of the relevant facts are not in dispute. This action arose out of the design and construction of the 11-story, 550-bed teaching hospital (the hospital or the project) on the campus of the Medical College of Virginia, Virginia Commonwealth University (VCU). In 1971, VCU engaged the services of Ellerbe Architects and Engineers (Ellerbe or the architects) of St. Paul, Minnesota, for the early planning stages of the project. Ellerbe, in turn, engaged the services of Lee, King, Poole & White (LKP&W), a Richmond architectural firm, to assist Ellerbe as associate architects. In January 1976, VCU advised Ellerbe to proceed with the preparation of preliminary plans and specifications. The parties entered into a contract on April 30, 1976 for Ellerbe to design the working drawings and to administer the construction contract.

The 1976 contract incorporated by reference the "Manual for the Planning and Execution of Capital Outlays" (the Blue Book) and its attached General Conditions, published by the Division of Engineering and Buildings of the Office of the Governor. The contract divided the architects' basic services into four phases: schematic design, preliminary design, working drawings, and construction. During the initial phase, the architects were required to assist VCU in planning the project and in developing additional detail, including schematic plans. Blue Book § 43.02.3. As a sec-

ond phase, the architects agreed to supply preliminary drawings "to fix and describe the size and character of the entire Project". *Id.* § 43.03(A). In the working-drawings phase, Ellerbe was obligated to provide detailed drawings setting forth the nature and extent of the work to be performed, the materials, equipment, and supplies required, and the methods of installation and construction. *Id.* § 43.04.

With respect to Ellerbe's duties during the construction phase, the contract provided:

The Architect or Engineer shall check construction schedules; keep the Owner informed of progress of the work; check and approve shop drawings; approve materials and equipments and tests thereof; maintain accounts for the work, including the issuing of change orders at the direction of the Owner; check Contractor's applications for payment, and issue Certificates for Payment in approved amounts; and provide on-site observation of the work.

*Id.* § 45.03. The employment contract also required Ellerbe to visit the construction site at least twice a month "to familiarize [itself] generally with the progress and quality of the work and to determine in general if the work is proceeding in accordance with the contract documents." *Id.* § 45.06. Finally, the contract charged Ellerbe with the duty to "make [its] recommendation to the Owner on all change orders to the construction contract". *Id.* § 45.09.

Under the contract, Ellerbe's fee was based on a percentage of the cost of construction. VCU was required to pay Ellerbe periodically for services performed: 15 percent of the fee was due after completion of the schematic phase, 25 percent after Ellerbe finished the preliminary design, 75 percent after completion of the working drawings, 95 percent as construction progressed, and 100 percent after Ellerbe submitted "as-built" drawings for the project. *Id.* § 50.07. The employment contract also provided that VCU would pay the architects additional fees for services provided after final payment to the contractor and beyond the contractor's one-year guarantee period. *Id.* § 46.01(E); *see also id.* § 45.02.

VCU hired the New Jersey consulting firm of Wood & Tower to advise VCU on methods to curtail construction costs, and based

on that firm's recommendation, VCU asked Ellerbe to expedite the documents relating to the hospital's structural steel to enable VCU to solicit bids for that portion of the project in a more favorable market. Ellerbe complied with the request but advised VCU that issuance of the structural package prior to completion of the architectural, mechanical, and electrical drawings likely would result in the need for revisions of that package and possible additions to the contract price, a concern endorsed by Wood & Tower.

Ellerbe completed the remaining working documents in May 1977, and VCU advertised for bids on construction that summer. Blake Construction Company (the contractor) of Washington, D.C., was the low bidder, and VCU entered into an agreement with the contractor on October 21, 1977 for the bid price of $42,374,000. The construction contract set November 29, 1980 as the project's scheduled date of completion.

Construction was plagued with delays, which each party claims were due, in part, to the fault of the other. As a result, VCU, Ellerbe, and the contractor agreed to a one-year extension of the contract to November 30, 1981. The project still was not complete in February 1982, and VCU began withholding payment of fees due Ellerbe. Construction of the hospital finally was substantially complete in June 1982.

## II.  PROCEEDINGS

The parties were unable to settle their dispute concerning the fees, and Ellerbe[1] filed a motion for judgment against the Commonwealth, its Comptroller, and VCU (collectively, VCU). VCU denied that it owed any fees to Ellerbe and filed a counterclaim alleging that Ellerbe breached its contract with VCU by defectively designing certain portions of the project and by failing to perform its duties to administer the construction contract. In its grounds of defense to VCU's amended counterclaim, Ellerbe asserted that the claim for design defects was barred by the statute of limitations and that all of VCU's claims had been satisfied in a settlement consummated between VCU and the contractor.

---

[1] Named as plaintiffs were Donald C. G. Nelson, Malcolm L. Nietz, Roger D. Santelman, and Dennis F. Walsh, all partners in Ellerbe.

The case was tried to a jury, and after VCU concluded its case on the counterclaim, Ellerbe moved to strike the evidence on the grounds that VCU's design claims were time-barred, that VCU had failed to establish by competent testimony the applicable standard of care and the alleged breach thereof, and that VCU had failed to prove its damages with reasonable certainty. The trial court held that the design-defect allegations were time-barred but otherwise overruled Ellerbe's motion. At this stage of the proceedings, VCU agreed that its sole remaining claim against Ellerbe was for breach of its contract administration duties and that its damage claims were limited to architectural malpractice in four areas: (1) in administering construction of the curtain wall system (the outer skin of the building); (2) in administering construction of the heating, ventilation, and air conditioning (HVAC) systems; (3) in attaining compliance with life-safety codes; and (4) in managing the proposed change orders (PCO's).

By its verdict, the jury awarded Ellerbe $800,623.09 on its fee claims and VCU $1,286,750.00 on its counterclaim, and the trial court entered judgment confirming the verdict. We granted Ellerbe an appeal from the judgment on the counterclaim and agreed to consider VCU's assignments of cross-error addressed both to its counterclaim and to Ellerbe's action for unpaid fees. Upon request, we permitted the Virginia Society of Architects/AIA to appear on brief *amicus curiae*. We consider, first, two questions which we find dispositive of the several issues relating to VCU's counterclaim.

## III.  VCU'S COUNTERCLAIM

### A.  Expert Testimony

Ellerbe asserts that VCU failed to carry its burden to establish the standard of care required of Ellerbe in its contract administration duties and the alleged breach of those duties. Specifically, Ellerbe claims that VCU was required to produce but failed to produce qualified expert testimony relating to Ellerbe's duties during the construction phase as distinct from its duties during the earlier phases of the project.

■ Absent a provision to the contrary, implicit in every contract of employment between an owner and an architect is the duty of the architect to "exercise the care of those ordinarily skilled in the business". *Surf Realty Corp.* v. *Standing*, 195 Va.

431, 442-43, 78 S.E.2d 901, 907 (1953). This professional standard of care applies to the administration of project construction as well as to project design. *Id.; see also Virginia Military Institute* v. *King,* 217 Va. 751, 760, 232 S.E.2d 895, 901 (1977) (hereinafter *VMI*); *Willner* v. *Woodward,* 201 Va. 104, 107-08, 109 S.E.2d 132, 134 (1959). Consistent with this standard, the contract of employment between Ellerbe and VCU provides, "The Architect or Engineer will administer the project consistent with normal architectural and engineering practices to assure that construction is in accordance with the contract documents." Blue Book § 62.04.

■ Although we have not had occasion previously to decide whether expert testimony generally is required to establish the standard of care owed by an architect and any departure from that standard, we have ruled with regard to the standard of care in certain highly technical professions that expert testimony is required unless the matters pertaining to the duty and the breach are obvious "from ordinary human knowledge and experience". *Bly* v. *Rhoads,* 216 Va. 645, 650, 222 S.E.2d 783, 787 (1976) (medical malpractice); *see also Ford Motor Co.* v. *Bartholomew,* 224 Va. 421, 430, 297 S.E.2d 675, 679 (1982) (automotive transmission design). Expert testimony is not required, indeed is inadmissible, in cases in which the facts and circumstances are within the common understanding and experience of the average, lay juror. *See Richmond Newspapers* v. *Lipscomb,* 234 Va. 277, 296, 362 S.E.2d 32, 42 (1987); *Coppola* v. *Commonwealth,* 220 Va. 243, 252, 257 S.E.2d 797, 803-04 (1979), *cert. denied,* 444 U.S. 1103 (1980).

■ A majority of jurisdictions that have considered the issue have applied, and we now adopt, the general rule that the practice of architecture is sufficiently technical to require expert testimony to establish the standard of care and any departure therefrom. *See, e.g., H. Elton Thompson & Assoc., P.C.* v. *Williams,* 164 Ga. App. 571, 572, 298 S.E.2d 539, 540 (1982); *Overland Constructors* v. *Millard School Dist.,* 220 Neb. 220, 229-30, 369 N.W.2d 69, 76 (1985); *see also* Annot., 3 A.L.R. 4th 1023 (1981 & Supp. 1987).

While, as VCU points out, a few courts have applied the general rule and its qualification differently, *see, e.g., Jaeger* v. *Henningson, Durham & Richardson, Inc.,* 714 F.2d 773, 776 (8th Cir. 1983); *Bartak* v. *Bell-Galyardt & Wells, Inc.,* 629 F.2d 523 (8th

Cir. 1980), the cases cited by VCU involved actions sounding in tort and entailing only a failure of the architect to discharge one aspect of the duty to administer construction, namely, the obligation to ensure that the contractor complied with the project's specifications and plans.[2]

■ An architect's duty to administer construction is not so narrow. As we explained in *VMI*, 217 Va. at 761, 232 S.E.2d at 901, a case involving an earlier version of the form employment contract executed by Ellerbe and VCU,[3] the responsibility of administering the construction contract involved the duties "not only to assure compliance by the contractor with the plans and specifications, but also to detect any defects in the design and recommend to the owner any necessary changes and corrections as construction progressed." In other words, as a second aspect of their administration duties, "[t]he architects were obligated to report any serious problem with the design before construction was completed if they reasonably should have known of the problem." *Id.* at 760-61, 232 S.E.2d at 901. The issues involved in VCU's counterclaim against Ellerbe relate to both aspects of Ellerbe's administration duties.

As we have said, after the trial court struck its design-defect claims, VCU addressed its architectural malpractice claims to four components of the construction project. First, VCU alleged that the architects had misdesigned the curtain wall system and that they had breached their duty to discover the design defect and recommend corrective measures in a timely manner.[4]

---

[2] In *Valley Company* v. *Rolland*, 218 Va. 257, 260, 237 S.E.2d 120, 122-23 (1977), we explained the general nature of this aspect of an architect's contractual duty to administer the construction of a project he has designed:

> [T]he owner customarily employs the architect to monitor the performance by the builder. The purpose of this employment is to assure that the owner will get a finished product in accordance with the plans which he has approved. The duty of the architect is to protect the owner to the end that the quality of the workmanship that goes into the project, and the kind and quality of the materials that are used, will be in accordance with the plans and specifications upon which the owner and architect have agreed.

[3] The Blue Book provisions regarding Ellerbe's administration duties were virtually identical to those relating to the architects in *VMI* under the manual's prior edition. *Compare* Blue Book § 45.03 (1974) (quoted above) *with VMI*, 217 Va. at 753, 232 S.E.2d at 897 (Former Blue Book § 45.01).

[4] VCU contended that Ellerbe should have designed the system to include flashing in the walls to divert to the exterior of the building the flow of any rain water which infiltrated the wall panels, that Ellerbe's design relying upon gaskets and sealants was defective, and

Second, VCU claimed that Ellerbe had misdesigned the HVAC systems,[5] that a "shutter" the contractor had installed as a part of the ventilation system did not satisfy specifications, and that Ellerbe failed to discover and report the contractor's error and the defects in its own design in time to avoid the resulting expense.

Third, VCU alleged that Ellerbe had misdesigned the life-safety system; that the contractor, in compliance with Ellerbe's specifications, had installed exit signs, fire-rated partitions, light fixtures, hardware, and other "punchlist" items that did not comply with life-safety codes; and that Ellerbe had failed to discover and report the design defects and the code violations in time to avoid the expense of replacement.

Fourth, VCU contended that other defects in Ellerbe's design required VCU to accept proposals for change orders that resulted in cost increases and that Ellerbe was liable for damages resulting from its failure to process and resolve PCO's in an expeditious manner.

■ Applying the qualification inherent in the general rule we have defined, we find that the question whether the architects in fact failed to discover and report the contractor's deviations from plans and specifications was a question of fact involving matters within the common understanding and experience of the average, lay juror. Our conclusion, however, does not dispose of Ellerbe's contention that VCU failed to offer the expert testimony necessary to define the standard of care applicable to Ellerbe's administration duties and to prove a violation of that standard.

■ VCU did not bargain for and Ellerbe did not guarantee infallibility in the performance of its duties of construction administration. *See VMI*, 217 Va. at 762, 232 S.E.2d at 902; *Surf Realty Corp.*, 195 Va. at 443, 78 S.E.2d at 908. While Ellerbe's contract with VCU required the architects, *inter alia*, to "check and approve shop drawings; approve materials and equipments and tests thereof; . . . and provide on-site observation of the work", Blue

that Ellerbe was liable for the costs VCU incurred in dismantling the wall panels and installing the flashing.

[5] VCU asserted that Ellerbe had specified inadequate pressure fans and substandard ductwork, mislocated the air-monitoring stations, omitted drains in the air-handling devices, and failed to include "balancing cocks" for the radiation units. As a result, VCU charged, the HVAC systems were insufficient to maintain levels of pressure, temperature, and humidity required in portions of the hospital complex.

Book § 45.03, the contract only required the architects to perform these administration duties "consistent with normal architectural . . . practices", *id.* § 62.04. Accordingly, VCU had the burden of proving not merely that the contractor installed several items in violation of the plans and specifications or that the project contained defects in its design, but also that the architects failed to perform their administration duties "with a reasonable degree of technical skill", *Surf Realty Corp.*, 195 Va. at 442-43, 78 S.E.2d at 907, in that they failed to disclose "to the owner the consequences of errors in design or construction that [were] so obvious and well known to [their] profession that [they] should [have] know[n] of them", *VMI*, 217 Va. at 762, 232 S.E.2d at 901. This standard of care properly should have been the subject of expert testimony because the trier of fact is not permitted to speculate as to the professional standard against which to measure the reasonableness of an architect's actions or inaction.[6]

We now examine the record to determine whether VCU adduced the expert testimony necessary to prove that Ellerbe was guilty of malpractice in the performance of its administration duties respecting the four components of the construction project implicated in VCU's claims.

The testimony of VCU's witnesses, Frederic H. Cox, Jr., and Thomas A. Schwartz, both experts in curtain wall systems, was intended to show that Ellerbe's design of that system permitted water infiltration. Neither Cox, Schwartz, nor any other expert was asked to define the standard of care required of architects in the discharge of their construction administration duties to discover and report design defects as distinguished from the standard of care required of them in the design phase of the project.

Hsing-Chung Yu, VCU's expert in HVAC systems, testified that the contractor had installed the wrong "shutter" as part of the hospital's ventilation system and that Ellerbe had failed to "spot check [to] make sure the contractor ha[d] properly bal-

---

[6] Apparently, the trial court recognized that qualified expert testimony was necessary when it stated to VCU, "It seems to me you have got to prove first it was a design defect, or something due to their supervision . . . and that's got to be proved by professional witnesses." Nevertheless, the trial court refused Ellerbe's instruction G, which would have prohibited the jury from finding Ellerbe in breach of its contractual commitment by deviation from the standard of care "unless that standard . . . and the departure from that standard has been established by expert testimony."

anced" the radiation system. However, Yu was not an architect, he was not trained in the duties of construction administration, and he was not qualified to give expert testimony concerning architectural malpractice.

For its proof regarding violations of the life-safety codes, VCU relied upon the testimony of Frederic Cox. Cox stated that Ellerbe's design was responsible for approximately $175,000 of the cost of the changes made to bring the project into compliance. Although qualified to testify concerning the standard of care expected of an architect in detecting and reporting code violations and Ellerbe's failure, if any, to administer the construction of the hospital in accordance with the standard of care, Cox never was asked to do so. Perhaps this was because Cox had acknowledged on direct examination by VCU that "an architect [should not] be criticized for coming up with $175,000 in errors on a building of this magnitude".

VCU's proof of its allegation of Ellerbe's malpractice in administering the system of PCO's consisted almost entirely of the testimony of Mark M. Kiley, an engineer who qualified as an expert in construction administration. Kiley testified that, in his opinion, Ellerbe was responsible for a portion of the costs associated with 326 of the PCO's resulting from errors, omissions, and conflicts in the architects' plans and specifications. The trial court ruled that he would not be permitted to quantify the actual costs attributable to the architects, and that ruling is the subject of an assignment of cross-error by VCU. Kiley did testify that, when he was hired by VCU as the project manager in January 1980, the architects had been ignoring their duties concerning the resolution of PCO's. His testimony on cross-examination revealed, however, that "most of the PCO work was done by July, 1982", the approximate date of substantial completion, and he acknowledged that "the contractor [was] directed to make the change in all of [the PCO's] before that period of time".

Although Kiley qualified as an expert in construction administration, neither he nor any other expert witness testified concerning the standard of care expected of an architect in resolving PCO's or Ellerbe's violation of that standard. While Kiley did believe that the total costs of the PCO's was disproportionate to the contingency set aside for changes in the project, VCU cannot establish Ellerbe's malpractice through a disparity in the estimated cost of changes and the cost actually incurred. *See Pipe Welding*

*Supply Co. v. Haskell, Conner & Frost,* 61 N.Y.2d 884, 885-86, 462 N.E.2d 1190, 1190-91, 474 N.Y.S.2d 472, 472-73 (1984).

■ VCU's proof also failed to include qualified expert testimony to assist the jury in determining whether Ellerbe's responses to the PCO's were the subject of inordinate delays. Absent such testimony, it would be difficult, if not impossible, for a lay juror to form a reasoned opinion as to whether, given the nature and number of PCO's, the delay constituted architectural malpractice. *See 530 East 89 Corp. v. Unger,* 43 N.Y.2d 776, 777, 373 N.E.2d 276, 277, 402 N.Y.S.2d 382, 383 (1977). Similarly, expert testimony was needed to determine whether the architects' assessment of the cost of each PCO reflected the accuracy expected in the business. *See Chicago Col. of Ost. Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1346 (7th Cir. 1983); *Peerless Insurance Co. v. Cerny & Associates, Inc.,* 199 F.Supp. 951, 955 (D. Minn. 1961).

■ In summary, our search of this voluminous record discloses no expert testimony sufficient to enable a jury of laymen to learn the standard of care required of architects in the performance of their duties to administer construction and to determine whether Ellerbe had violated those duties. We hold, therefore, that VCU failed to prove the several claims underlying its allegation that Ellerbe breached its contractual commitment to administer the construction phase of the project.[7]

## B. Statute of Limitations

Obviously, in the course of marshalling its evidence for trial and during conduct of the trial on its counterclaim, VCU placed primary emphasis upon its design-defect claims. On appeal, VCU contends that the trial court erred in ruling that those claims were barred by the statute of limitations. Specifically, VCU argues that Ellerbe's "duties under the design and construction phase of the contract were not divisible" and that, because Ellerbe "retained rights to correct a design defect until the building [was] completed", its services were "ongoing" and the limitations period should not have run while the contract continued.

---

[7] In light of our holding with respect to these claims, we need not consider Ellerbe's assignments of error relating to VCU's proof of damages and jury instructions or VCU's several assignments of cross-error challenging evidentiary rulings issued during the trial of these claims.

■ In *VMI*, we encountered a similar argument by the owner under prior provisions of the same form contract executed by Ellerbe and VCU. As in the case at bar, the employment contract in *VMI* divided the architects' performance of the contract into consecutive phases, with varying duties detailed for each phase, and with compensation to the architects reflecting an increasing proportion of the construction cost as each phase was completed. In *VMI*, we found that a cause of action for improper design accrued when the plans were approved by the owner because, "[a]t that time, the architects had a right to demand and received payment for their services for that phase of their undertaking. At that time, if defects had been discovered, [the owner] could have initiated legal proceedings against the architects." 217 Va. at 759, 232 S.E.2d at 900. While we made a merits adjudication of the issues relating to the owner's claims for the architects' failure to detect and recommend corrections of its own design defects, we refused to consider the owner's design-defect claims because we concluded that they were time-barred.

VCU urges us to apply our decision in *County School Bd.* v. *Beiro*, 223 Va. 161, 286 S.E.2d 232 (1982). In *Beiro*, the owner of a public school building brought an action against the contractor claiming damages due to a defective roof. Because the construction contract had reserved to the contractor until final payment had been approved the right to correct any defects in construction, we held that the contract was not divisible. Therefore, although the contractor had completed his work on the roof well before the architect issued the certificate of final payment, we held that no cause of action accrued until the date of the certificate. *Id.* at 163, 286 S.E.2d at 233.

■ Our decision in *Beiro* is inapposite to the facts in this case. The contract in issue here, like the contract we considered in *VMI*, is divisible. Once Ellerbe's plans were accepted by VCU in July 1977, Ellerbe had completed its duties under the working-drawings phase of the project and was entitled to demand full payment of its fees attributable to that phase. At that point, a new phase began, and the time in which VCU could assert an action based on the drawings submitted began to run on that date.

■ Nor is application of the rule of *VMI* affected by our decision in *Keller* v. *Denny*, 232 Va. 512, 352 S.E.2d 327 (1987), as counsel for VCU urged in oral argument. In *Keller*, a client sued his attorney for malpractice in the handling of a transaction in-

volving the sale of shares of stock in a corporation. The client alleged that the attorney neglected instructions to include in the stock purchase agreement a provision permitting the client to repurchase the stock upon the happening of certain events. Although the attorney had completed and supervised execution of the necessary documents in 1975, his error was not detected until 1980 when he was reviewing the documents at the request of the client who wanted to reacquire the stock. The client terminated his relationship with the attorney in 1980 and filed suit against him in 1982. We stated that:

> [W]hen malpractice is claimed to have occurred during the representation of a client by an attorney with respect to a particular undertaking or transaction, the breach of contract or duty occurs and the statute of limitations begins to run when the attorney's services rendered in connection with that particular undertaking or transaction have terminated, notwithstanding the continuation of a general attorney-client relationship, and irrespective of the attorney's work on other undertakings or transactions for the same client.

*Id.* at 518, 352 S.E.2d at 330.

Applying these principles, we held that the attorney's undertaking was one of a continuing nature and was not completed upon the mere drafting and execution of the contract documents. Accordingly, the statute of limitations on the client's cause of action did not begin to run until the relationship between the parties ended with respect to the entire transaction. We noted, however, that the rule stated in that case "is applicable only when a continuous or recurring course of professional services relating to a particular undertaking is shown to have taken place over a period of time." *Id.*, 352 S.E.2d at 331.

Here, as in *VMI*, the architects' undertaking in their contract with the owner involved several separate and distinct phases. Although Ellerbe was obligated to administer the construction phase of the project, its duties to design the project ended, as we have said, upon VCU's acceptance of the working drawings. It is true that a general architect-owner relationship continued to exist, but the design services offered by Ellerbe were severable and not "continuous or recurring", *see id.*, and the statute of limitations

began to run on VCU's design-defect claims when Ellerbe completed the design phase of the undertaking.

These claims arose out of a contract "in writing and signed by the party to be charged thereby," and the applicable period of limitations, therefore, was five years. *See* Code § 8.01-246(2); *see also VMI*, 217 Va. at 758-59, 232 S.E.2d at 899-900. Because VCU filed its counterclaim on February 22, 1983, more than five years after its cause of action for design malpractice had accrued, the design-defect claims were time-barred.

In an alternative argument, VCU suggests that Ellerbe, by not asserting its statute of limitations plea in its initial response to VCU's counterclaim, waived the defense. The record shows that both parties were granted leave to file amended pleadings and that Ellerbe was permitted to include in its reply to VCU's amended counterclaim its plea of the statute of limitations. "Leave to amend shall be liberally granted in furtherance of the ends of justice", Rule 1:8, and absent a showing of prejudice, we will uphold a ruling of the trial court permitting amendments. *See Herndon* v. *Wickham*, 198 Va. 824, 826-27, 97 S.E.2d 5, 7 (1957) (affirming decision to allow delay in filing statute of limitations defense until eight days before trial).

VCU complains that it was prejudiced "in the preparation and presentation of its case" because the defense was asserted "only thirteen (13) days before the trial of this matter began." Yet, we note that, like the plaintiff in *Herndon*, VCU "did not request continuance of the case to a later date", *id.* at 827, 97 S.E.2d at 7, and we find no prejudice sufficient to support VCU's suggestion of waiver.

## IV. ELLERBE'S CLAIMS FOR UNPAID FEES

### A. *Extended Work Effort*

In change order number 7, "issued and recommended" by Ellerbe on October 23, 1980, "accepted" by the contractor, and "approved" by VCU, the construction completion date was extended 12 months to November 30, 1981. A four-page memorandum incorporated into the change order provided that the time extension was granted upon acceptance of certain conditions, including the following:

5. Any and all claims for delays prior to the date of execution of this change order attributed to or caused by the Owner, the Architects, or previous contractors on this project shall be waived by the Contractor (Blake) by this change order.

In its amended motion for judgment, Ellerbe sought recovery of a fee for the work it performed after the original construction completion date. *See* Blue Book § 50.09. VCU attempted to introduce the testimony of Louis C. Saksen, an architect who was VCU's Director of Facilities Planning and Construction, to prove that Ellerbe orally had agreed to waive any such fee in consideration of its release from liability for delay damages. The trial court found that change order number 7 constituted a complete integration of the parties' agreement and ruled that the testimony was barred by the parol evidence rule.

VCU assigns cross-error to that ruling. VCU argues that, although the change order is not ambiguous, it is "not a clear and complete integration of the parties' agreement" and that VCU should be permitted to introduce evidence of a collateral agreement that is "consistent with the change order and . . . enforceable as a mutual release against liability for delay."

In response, Ellerbe says that VCU's contention that the change order compromised Ellerbe's rights under its contract with VCU reflects a misconception of the nature of a change order. Change orders, Ellerbe asserts, affect only the construction contract between an owner and a contractor and have no effect on an architect who merely "issues and recommends" such changes as part of his contract administration duties.

We disagree with VCU's position. The architects had a duty to make a "recommendation to the Owner" regarding proposed changes in the project, Blue Book § 45.09, but only the owner could approve the changes and then only upon terms acceptable to the contractor, *id.*; *see also id.* § 41.01; *id.* General Conditions § 47. Absent a provision to the contrary, one specifically endorsed by Ellerbe, any change order executed by the parties affected only the contract between VCU and the contractor. *See Doyle & Russell* v. *Welch Pile Driving*, 213 Va. 698, 702, 194 S.E.2d 719, 722 (1973).

Neither the executed change order form nor the memorandum incorporated therein provided that Ellerbe waived its fee for

the services it performed after the original construction completion date. We believe that any such consequential waiver would have been incorporated expressly in the text of the change order. Because its terms are set out "in a clear and explicit writing", *see Renner Plumbing* v. *Renner*, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983); *Durham* v. *Pool Equipment Company*, 205 Va. 441, 446, 138 S.E.2d 55, 59 (1964), and the document "is capable of a clear and intelligible exposition from the terms of which it is composed", *see Hughes* v. *Tinsley & Brother*, 80 Va. 259, 263 (1885), we hold that change order number 7 was a complete integration of the parties' agreement and that Saksen's testimony properly was excluded under the parol evidence rule.

Nor is that testimony admissible under the collateral-contract doctrine. "Under this doctrine the parol evidence rule does not exclude parol proof of a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing." *High Knob, Inc.* v. *Allen*, 205 Va. 503, 506, 138 S.E.2d 49, 52 (1964); *see also Pierce* v. *Plogger*, 223 Va. 116, 119, 286 S.E.2d 207, 209 (1982). Saksen acknowledged in his proffered testimony that change order number 7 did not modify the architects' agreement with VCU and that VCU "never got any other agreement with them to modify it either." In response to questions from the bench, Saksen admitted that VCU had "no agreement with Ellerbe in regard to fees except those that are set forth in the basic agreement." The trial court ruled that the testimony was inadmissible because no collateral agreement existed, and we find no error in that ruling. *See Slaughter* v. *Smither*, 97 Va. 202, 206-08, 33 S.E. 544, 545-46 (1899).

Pursuing its challenge to the fees in question, VCU argues that the trial court erred in submitting Ellerbe's claim to the jury because, it asserts, section 50.09(H) of the Blue Book "restricts delay damages to those cases where Ellerbe is not in part responsible for delay."

Section 50.09 of the Blue Book provides:

> *EXTRA ALLOWANCES.* The charges as fixed under [the provisions for the architects' basic fee] may be increased under the following conditions:
>
> . . . .

H. Where unforeseen delay occurs in the construction phase which may occasion additional expenses on the part of the Architect or Engineer, such as the construction contract time being exceeded or extended by more than 20% through no fault of the Architect or Engineer.

VCU argues that, because "unrebutted evidence showed that [Ellerbe] contributed to the delay", Ellerbe should not have been permitted to recover additional fees in contravention of the "no damage clause". In response, Ellerbe says that subsection (H) merely provides one scenario under which the architect is entitled to extra compensation and that the scenario provided is not preclusive.

■ We agree that subsection (H) does not posit all possible circumstances under which the architects would be entitled to extra allowances. Assuming without deciding that section 50.09(H) is an enforceable no-damage clause as VCU asserts, Ellerbe's claim for fees due on account of the extension of the construction period presented a factual question whether the extension was an "unforeseen delay" within the contemplation of that section. While subsection (H) provided the jury one example of circumstances that might constitute unforeseen delay, the jury reasonably could have found from the evidence before it that the contract period was "extended by more than 20% through no fault of the Architect". Because reasonable minds could differ on the question whether Ellerbe was thus entitled to an extra allowance on account of the extension of the construction period, we will uphold the trial court's decision to submit to the jury Ellerbe's claim for extended work effort.

### B. LKP&W's Invoice

■ VCU argues that the trial court erred in submitting to the jury that portion of Ellerbe's claim for delay damages attributable to LKP&W's bill for architectural services rendered during the 12-month extension. Specifically, VCU contends that delay damages are recoverable by Ellerbe only pursuant to the remedies established by the Blue Book and that, while section 50.09(J) permits recovery of extra allowances for the "[e]mployment of consultants under the provision of Section 43.02.3", LKP&W was not a consultant approved by the Governor as required by the latter section.

That section provides in pertinent part:

> *PROJECT CRITERIA (SCHEMATIC DESIGN PHASE).* Upon receipt of the Governor's authorization to initiate planning for a project, the Architect or Engineer may be engaged to assist the Owner in preparing the Project Criteria. The purpose of the Project Criteria is *to develop additional detail, including schematic plans* . . . .

> Employment of consultants by the Owner to develop a program relating to a capital outlay project may be necessary, from time to time, on projects of special nature or complexity. *This data would, presumably, be made a part of the Project Criteria.*

> . . . .

> If, after the employment of an Architect or Engineer for the *design* of the project, the Owner, Architect or Engineer desires the services of a consultant, which will require compensation by the Owner beyond the fee of the principal Architect or Engineer . . . approval must be obtained from the Governor.

(Emphasis added.) Obviously, this provision does not govern Ellerbe's claim for LKP&W's fees. By its very terms, it relates only to the schematic-design phase of the project. Significantly, the work product of any such consultant would be "made a part of the Project Criteria" which is used "to develop additional detail, including schematic plans". Ellerbe's claim for LKP&W's fees related, instead, to the extension of Ellerbe's contract administration duties during the *construction* phase of the project.

█ As we read the provisions of the Blue Book, LKP&W's fees were recoverable, not as consultant fees under section 50.09(J) but as extra allowances permitted by section 50.09(H) in the event of unforeseen delay. As Ellerbe correctly notes, subsection (H) does not distinguish between costs incurred by the architect in the use of its own employees and payments made to independent contractors hired to discharge Ellerbe's administration duties during a period of unforeseen delay. We hold, therefore, that the trial court did not err in its finding that the evidence of record raised a jury question whether LKP&W's fees were a proper element of Ellerbe's claim for extra allowances due to unforeseen delay.

## C. Basic Services and Additional Work Effort

In addition to its contentions regarding the extra allowances claimed by Ellerbe, VCU argues that the trial court should have reduced the amount of Ellerbe's claim for unpaid basic fees and should not have permitted the jury to consider Ellerbe's demand for fees due to additional work effort.

First, VCU asserts that Ellerbe's claim of $254,474.30 as basic fees payable as a percentage of the increases in construction costs reflects a miscalculation of the amount due under the contract by application of the wrong "multiplier". Through the testimony of Louis Saksen, VCU attempted to prove that, instead of computing the fees by applying a 5.5 percent multiplier to 25 percent of the net cost increase, Ellerbe erroneously used a 6.039 percent multiplier, the factor applied in the contract only to the schematic-design and preliminary-design phases of the project. VCU contends that added construction costs during Ellerbe's performance of its construction administration duties, "including costs attributable to changes in the working plans, are only compensable using a multiplier of 5.5" and that Ellerbe's claim, accordingly, should have been limited to $221,352.

We believe the evidence of record presented a jury question on the propriety of Ellerbe's calculation of its unpaid basic fees. Ellerbe's accounting supervisor, Kathleen E. Carleton, testified that her staff calculated the basic fee by applying a 6.039 percent factor to 25 percent of the construction cost and a 5.5 percent multiplier to the balance. Carleton also testified that VCU paid Ellerbe's invoices based on that formula, without objection, for four years. Receipted invoices reflecting that formula were entered into evidence. Hence, the jury had before it, on the one hand, VCU's evidence concerning its interpretation of the basic fee terms of the contract and, on the other, Ellerbe's evidence that it construed the terms differently and had billed and received payment for its fees accordingly.

"[Ordinarily it] is the duty of a court to construe a written contract, but whenever it is necessary to refer to testimony of witnesses in order to ascertain the contract, or to ascertain facts in the light of which the contract is to be construed, then the court is bound to refer such controverted matters of testimony to the decision of the jury."

*Combs* v. *Dickenson-Wise Medical Group*, 233 Va. 177, 184, 355 S.E.2d 553, 557 (1987) (quoting *Camp* v. *Wilson*, 97 Va. 265, 270, 33 S.E. 591, 592 (1899)).

■ Based on the testimony and evidence introduced below, we believe that reasonable minds could differ on the applicable multiplier, and we will not disturb the jury's award.

Under section 46.01 of the Blue Book, Ellerbe also claimed $71,474.84 in fees arising from its performance of additional administration services during the course of the original construction period. VCU contends that Ellerbe failed to prove its damages with reasonable certainty. VCU says that "Ellerbe did not put on any proof of actual damages resulting from additional work effort before November 25, 1980" in that "no amount of hours expended were proven." The trial court permitted the jury to consider Ellerbe's claim of fees for additional services, VCU argues, "according to the rule of *Pebble Bldg. Co.* v. *Hopkins, Inc.*, 223 Va. 188, 288 S.E.2d 437 (1982)", and VCU considers that rule inappropriate in this case.

■ In *Pebble Bldg. Co.*, a subcontractor sued the general contractor "to recover its actual, direct labor costs in excess of its estimated direct labor costs, alleging that the excess was attributable to delays caused by" the contractor. *Id.* at 189-90, 288 S.E.2d at 437-38. The subcontractor introduced evidence of its bid estimate of labor costs, including the number of man-hours required, and also evidence of the labor costs actually incurred and man-hours actually used on the job. To support the reliability of its estimates, the subcontractor offered evidence of the industry manuals it used in submitting its bid estimate. In holding that the subcontractor's evidence was sufficient to permit a reasonably accurate calculation of damages, we stated that "past experience had shown [the subcontractor] that these manuals provided relatively accurate and realistic predictions of the labor ultimately required on a properly supervised project." *Id.* at 191, 288 S.E.2d at 438.

VCU contends that Ellerbe's labor estimates were not based on a source customarily used in the industry and were not otherwise sufficiently reliable to invoke our decision in *Pebble Bldg. Co.* VCU says that the testimony of John Stetson, an architect who qualified as an expert witness in construction administration, established that "Ellerbe's construction administration budget was unusually low" and that "portions of its budget were based on

faulty assumptions . . . [such that] the amount of time budgeted for preparation of the construction documents was inadequate." Additionally, VCU asserts, "hours were included in the actual hours worked which . . . were not construction administration hours."

Ellerbe claims that it was required to perform much additional administrative work during the original construction period. This was caused, in part, by problems arising from VCU's request for the early issuance of the structural steel package, by the large volume of paperwork generated by VCU and the contractor in their requests for clarification and PCO's, and by VCU's request for design justifications several years after the hospital's design criteria had been approved. Ellerbe points out that Gerald A. Simons, its employee in charge of budgeting and scheduling on the project, testified that Ellerbe expended a total of 21,400 actual man-hours on the project and that the amount expended by Ellerbe for additional services within the original construction period translated into $71,474.84 in labor costs in excess of the cost of the man-hours budgeted by Ellerbe for that portion of the project. Simon and Donald C. G. Nelson, Ellerbe's principal in charge of the project, testified that Ellerbe based its budgetary estimates on its extensive experience in designing and administering the construction of hospitals and that those estimates usually proved to be accurate. Nelson's testimony also revealed that, during its 75 years of practice, Ellerbe was the principal architect for approximately 30 of the 105 medical schools in the country and 600 of the nation's hospitals. Ellerbe asserts that the jury had sufficient evidence before it to draw a reasonable inference regarding the quantum of Ellerbe's damages resulting from additional services performed, all at VCU's request, during the original construction period.

We agree. As we explained in *Pebble Bldg. Co.*, while a plaintiff has the burden of proving his damages, " 'absolute certainty as to the amount of the damages is not essential when the existence of a loss has been established.' " 223 Va. at 191, 288 S.E.2d at 438 (quoting *Wyckoff Pipe, etc., Co.* v. *Saunders*, 175 Va. 512, 518, 9 S.E.2d 318, 321 (1940)). The trier of fact may fix the amount of damages " 'when the facts and circumstances are such as to permit . . . an intelligent and probable estimate thereof' ", *id.*, and we hold that the trial court did not err in submitting this damage claim to the jury.

## V.  CONCLUSION

We will affirm the judgment insofar as it confirms the jury's verdict for Ellerbe on its several claims for unpaid fees. We will reverse the judgment insofar as it confirms the jury's verdict for VCU on its counterclaim and enter final judgment here for Ellerbe.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*