## Pioneer National Title Insurance Company, et al.

### v.

## C. Richard Cranwell, et al.

Record No. 850519

June 10, 1988

Present: All the Justices

*Denis C. Englisby (Englisby, Barnes & Allen*, on briefs), for appellants.

*William Rosenberger, Jr. (William S. Smithers, Jr.; R. Paul Childress, Jr.; Thompson, Smithers, Newman & Wade*, on brief), for appellees.

THOMAS, J., delivered the opinion of the Court.

On February 15, 1983, Pioneer National Title Insurance Company and Ticor Title Insurance Company, successor of Pioneer Title Insurance Company (collectively Pioneer), sued C. Richard Cranwell and Barry L. Flora, trading as Pedigo, Cranwell & Flora, attorneys at law (collectively the Pedigo Firm), for breach of an approved attorney agreement and breach of certain disbursing instructions regarding a $2.55 million loan. The loan was made by Sackman-Gilliland Corporation (the Lender) to James E. Long Construction Co. (Long Construction), one of the Pedigo Firm's clients, for construction of the Tanglewood South Apartment complex in Roanoke. The motion for judgment sets forth eleven specific acts or failures to act on the part of the Pedigo Firm which are said to constitute breaches of contract. We divide those specific allegations into the following four broad categories:

1. Allegations that the Pedigo Firm failed to report mechanics' liens; and that it certified title; requested ad-

ditional advances; and requested the issuance of title insurance, all despite the existence of mechanics' liens on the subject property;

2. Allegations that the Pedigo Firm paid mechanics' lienors out of escrowed funds without first advising Pioneer and securing Pioneer's approval;

3. Allegations that the Pedigo Firm failed to notify Pioneer of claims and threats of litigation involving the subject property; and

4. Allegations that the Pedigo Firm improperly disbursed funds from the construction loan for matters totally unrelated to the construction project.

The case was tried to a jury. Pioneer sought to prove its case based, in large part, on a trail of documentary evidence. The majority of the testimony came from C. Richard Cranwell, who was called by Pioneer as an adverse witness. At the end of Pioneer's case, the trial court granted defendants' motion to strike the evidence and entered summary judgment in their favor.

There are two issues before the Court in this appeal. The first is whether the trial court erred in granting the motion to strike. The second, which is raised by assignment of cross-error, is whether the suit was barred by the applicable statute of limitations. In our view, plaintiffs' evidence should not have been struck and there is no merit to the statute of limitations argument.

Even though this case developed as one in which testimonial and documentary evidence were pitted against each other, we are nevertheless bound to view *all* the evidence, and any reasonable inferences arising therefrom, in the light most favorable to the plaintiff resolving any doubt as to the sufficiency of the evidence in favor of the plaintiff. *McGowan* v. *Lewis*, 233 Va. 386, 387, 355 S.E.2d 334, 334 (1987).

We begin our review of the evidence with the two main documents relied upon by plaintiffs: the loan commitment and the approved attorney agreement. On October 17, 1973, Long Construction received a loan commitment from the Lender regarding "Tanglewood South Apartments, Overland Drive, Roanoke, Virginia." This reference line is repeated at the top of each page of the commitment. The commitment was for a land loan and construction loan "secured by the premises." The commitment required the submission of plans and required that construction pro-

ceed according to the plans. To insure construction according to the plans, the commitment provided for monthly loan advances based on inspections and progress reports. Final payment would not be made until the construction was complete.

The commitment made clear that the loan was to a corporate borrower, not to an individual. It provided that if the borrower's claimed corporate status did not exist or was lost, the Lender could refuse to make the loan. The commitment provided as follows concerning disbursements to the corporate borrower: "[T]he proceeds of the loan shall be paid directly to said corporate Borrower or shall be disbursed through a title company at the option of the lender and will be used solely for the proper corporate purposes of the Borrower."

The commitment claimed a security lien in the property as follows:

> The mortgage indebtedness within the contemplation of this commitment shall constitute a valid and subsisting first mortgage lien on said premises for the sum of $2,550,000.00 or so much thereof as shall at any time be advanced thereon on a title in fee satisfactory to the lender . . . .

Another provision required title insurance: "Title is to be insured to the lender, as mortgagee, to the extent of the total amount of the loan, and by a title company approved by the lender." Pioneer was retained to provide this insurance.

The commitment also contained anti-assignability language. That provision read in pertinent part as follows: "[T]his commitment shall in no event whatsoever be assignable by the borrower without the prior written consent of the lender in each instance."

Finally, the commitment was signed and accepted by James E. Long in his capacity as president of Long Construction. Significantly, Long did not sign in his individual capacity and, as we have said, according to the terms of the commitment, the loan was made to a corporate borrower, not to an individual borrower.

As noted, Pioneer was the title insurer for the project. However, the Pedigo Firm, which represented Long Construction and various other business entities owned or controlled by James E. Long, had no relationship with Pioneer and, thus, could not act as title attorneys and disbursing attorneys for the project. To cure this

problem, the Pedigo Firm and Pioneer executed an "Approved Attorney Agreement."

The attorney agreement stated that the parties were "desirous of entering into an agreement pursuant to which the Company will issue its policy of title insurance . . . based upon the services, title examinations and opinions of the Approved Attorney." The attorney agreement then set forth a series of matters to which the approved attorney agreed, including the following: that he "will not certify any title . . . if there is any litigation threatened or pending"; "that if prior to the closing or settlement or issuance of the title policy, there shall come to the knowledge of the Approved Attorney any matter adversely affecting the title to be insured or which would change the facts set forth in his application for insurance, he will promptly notify the Company"; that he "will not disburse funds entrusted to his care nor any part thereof unless he has certified that the title to the premises under examination is a good, marketable and indefeasible fee simple estate in the proposed insured"; that he "will not hold any funds in escrow pending later disposition of any objections or liens without first obtaining the approval of the company"; that he will "abide by and comply with all instructions of the Company concerning the title, the closing and disbursement of funds"; and that if after closing of any title or secured loan "any claim or suit is threatened or filed affecting the validity of the title covered by Approved Attorney's Certificate of Title" he will immediately notify the Company thereof, "in the event he has knowledge thereof, and [he will] assist and cooperate with the Company to the fullest extent to obtain a satisfactory disposition of such claim, suit or defect in title."

Using the commitment and the approved attorney agreement as backdrops, we turn now to the broad categories of allegations previously described. With regard to each category, we consider whether the evidence was sufficient to raise a jury issue.

### FAILURE TO REPORT MECHANICS' LIENS, IMPROPER CERTIFICATION OF TITLE

Pioneer established through documentary evidence and the testimony of Cranwell that on July 17, 1974, Bostitch Division of Textron filed a memorandum of mechanic's lien against the Tanglewood South project in the amount of $1,868.10; that this lien was not released until October 21, 1974; and that the Pedigo Firm

certified title to the Tanglewood South project on August 16, 1974, and again on September 12, 1974, without reporting the lien. Pioneer also established that on July 18, 1974, Dallas Womack, trading as Danville Pressure Seal, filed a memorandum of mechanic's lien against the project in the amount of $1,692; that this lien was not released until August 22, 1974; and that the Pedigo Firm certified title to the property on August 16, 1974, without reporting the lien. Further, Pioneer established that in the August and September 1974 certification letters, the Pedigo Firm requested the issuance of title insurance on the property.

■ The evidence adduced by Pioneer on the foregoing points was sufficient to raise a jury issue. This is true despite Cranwell's testimony that he did not report the liens because he had contacted the lienors and "worked out" an agreement to pay them. According to the terms of the approved attorney agreement, the Pedigo Firm was bound to report such liens because they adversely affected "the title to be insured." There can be no doubt that liens attached upon the filing of the two memoranda and remained in place until they were marked released on the land records. *See* Code §§ 43-3, 43-4, and 43-4.1.

### PAYMENT OF MECHANIC LIENORS
### OUT OF ESCROWED FUNDS WITHOUT PERMISSION

■ When the Pedigo Firm certified title despite the existence of the Bostitch and the Dallas Womack liens, it effectively advised the Lender and Pioneer that the funds advanced for the project up to the dates of certification had been spent in such manner that all contractors, subcontractors, and materialmen had been paid through the date of certification and that fresh funds could safely be advanced to pay for the work to be done from that date to the date of the next certification. But Pioneer established that the Bostitch and Dallas Womack liens, old liens, were paid with funds advanced to Long Construction and held by the Pedigo Firm in escrow for new work and new supplies. Pioneer also established that it was not notified of this procedure. Pioneer's evidence was sufficient to raise a jury issue with regard to the question whether the Pedigo Firm violated its agreement that it would "not hold any funds in escrow pending later disposition of objections on liens without first obtaining" Pioneer's approval.

## FAILURE TO NOTIFY PIONEER OF THREATS
## OF CLAIMS OR THREATS OF SUIT

Pioneer contends that the Pedigo Firm had knowledge of threats of claims or threats of suits by Moore's Division of Evans Products (Moore's), a materialman, but failed to report this information to Pioneer. Moore's ultimately filed a mechanic's lien against the Tanglewood South project in the amount of $292,358.68.

Virtually all of Pioneer's evidence on this issue comes from documents. Pioneer introduced a letter dated January 30, 1974, from the Pedigo Firm to Don Holman of Moore's discussing a deed of trust held by Moore's against certain property owned by Long Construction. This letter suggests general awareness on the part of the Pedigo Firm that Long Construction was indebted to Moore's.

By letter dated May 15, 1974, Don Holman wrote to James Long individually and to Long Construction concerning amounts owed to Moore's. A copy of that letter was sent to John Pedigo of the Pedigo Firm. The May 15 letter referred to possible courses of action open to each party; demanded a payment of "$100,000 plus" by May 17; and advised that Moore's was reserving its lien rights and would exercise those rights at an appropriate time if Moore's deemed it desirable to do so.

Pioneer introduced, as a group, three letters from Don Holman dated June 6, 1974. One letter was from Holman to both James Long individually and to Long Construction. A copy of that letter went to John Pedigo of the Pedigo Firm. It made reference to the May 15 letter, discussed above. It stated that its purpose was to summarize plans and actions relative to the balances owed to Evans Products. It demanded a formal assignment of at least fifty percent of each advance on the Tanglewood Project. It further demanded a minimum first payment by July 10, 1974, under the referenced assignment, totalling $100,000. And, significantly, in that letter Holman repeated what he had written in his May 15 letter: Moore's reserved its lien rights and would exercise those rights at an appropriate time if Moore's deemed it desirable to do so.

Additionally, Holman testified at the trial. He stated that he was in and out of the Pedigo Firm's offices to get checks from various closings of real estate sales, the proceeds from which were pledged to apply to Long's account with Moore's.

■ Despite the Pedigo Firm's position that it was unaware of any threats of claims or threats of suits against the property, we conclude that the evidence adduced by Pioneer was sufficient to raise a jury issue concerning breach of the Pedigo Firm's duty to notify Pioneer of threats of claims or threats of suits.

## IMPROPER DISBURSEMENT OF FUNDS

One major issue was whether the $2.55 million loan was solely for use in constructing the Tanglewood South project or whether it could be used for other purposes. The Pedigo Firm took the position that the use of the loan proceeds was not limited to the construction of Tanglewood South, but that the proceeds could be used by James Long to do with as he pleased so long as he used the money for the proper corporate purposes of James Long. Cranwell testified as follows: "[I]f you read the Commitment it states there that that's James Long's money. I don't know what James Long would have done if I wouldn't have spent his money the way he told me to."

Pioneer adduced evidence that the commitment referred to the "Tanglewood South Project" at the top of every page. Further, the commitment expressly required the use of a construction manager, an architect, title insurance, and a draw system for monetary advances, all aimed at insuring that the loan proceeds were spent to construct the Tanglewood South project. Moreover, Pioneer established that the loan was not to James Long individually, but to Long Construction and that the Pedigo Firm set up a separate fiduciary account for the Tanglewood South project.

Pioneer established further that the Pedigo Firm wrote two checks totalling $305,000 to Long Construction and Mountain Trust Bank as joint payees. The greater part of those payments had nothing whatever to do with the Tanglewood South project. Further, Pioneer established that payments of $11,000 were made by the Pedigo Firm from the Tanglewood South account on other matters wholly unrelated to the Tanglewood South project. Indeed, almost one half of the $11,000 in payments was made to the Pedigo Firm itself for work it had done regarding other businesses of James Long and other projects of Long Construction.

In its comments from the bench with regard to the motion to strike, the trial court stated that it was originally convinced that the disbursement issue raised a jury question, but became convinced that there was no jury question because of a September 18,

1974 interoffice memorandum written by Joseph Castro, who had reviewed James Long's financial records on behalf of the Lender. This document is not in the record because it was withdrawn after being introduced into evidence. Nevertheless, there is a description of the document in the record because portions of it were read to James Long during his testimony.

According to the testimonial reference to the document, it was not addressed to any official of the Lender. It was from Joseph Castro to "file." The memorandum apparently referred to "total confusion" in Long's bookkeeping. According to the testimony, the document went on to record that that there was only one checking account for all transactions; that invoices were not separated by job; that subcontractors and suppliers worked more than one job, yet did not invoice their work to a particular job; that lien waivers were being received and signed in blank with no dollar amount given; that the title company was accepting blank waivers and disbursing funds with no real assurance that the subcontractors were being paid; that Long appeared to be an incompetent builder; that a proper bookkeeping system needed to be set up; and, that Long was "in over his head" in apartment construction.

■ The trial court concluded that the Lender's failure — after receiving the Castro memorandum — to make changes in its disbursement instructions, coupled with the Lender's making another advance proved, as a matter of law, that the disbursements previously made by the Pedigo Firm had been properly made. We disagree.

The Castro memorandum was addressed to "file," and not to any of the officials of the Lender who routinely corresponded with the parties concerning the loan. In addition, an October 28, 1974 letter, to the Pedigo Firm from the Lender's representative who had handled this loan, made clear that at least one official had no knowledge of what had been happening with the disbursements from the Tanglewood South account maintained by the Pedigo Firm.

We conclude, the September 18 memorandum notwithstanding, that Pioneer adduced sufficient evidence to raise a jury issue on the question of improper disbursements.

## CROSS-ERROR REGARDING THE STATUTE OF LIMITATIONS

■ The trial court properly ruled that plaintiffs' case was not barred by the statute of limitations. In the approved attorney agreement, defendants agreed "to assist and cooperate with the Company to the fullest extent to obtain a satisfactory disposition" of claims, suits, or defects in title arising after the closing of any title or secured loan. Defendants were never fired and never quit. Defendants actually provided services in resolving the various claims filed against the property. The last claim was resolved November 15, 1978. The instant suit was filed February 15, 1983. It is a breach of contract action and was filed within five years of the termination of defendant's services to plaintiff; it was therefore timely. *See Keller* v. *Denny*, 232 Va. 512, 352 S.E.2d 327 (1987); *McCormick* v. *Romans and Gunn*, 214 Va. 144, 198 S.E.2d 651 (1973).

## CONCLUSION

For all the foregoing reasons, we hold that the trial court erred in granting the motion to strike at the conclusion of plaintiffs' case. We hold further that the trial court did not err in holding that plaintiffs' claims were not barred by the statute of limitations. Therefore, the judgment of the trial court will be affirmed in part, reversed in part, and the case will be remanded for a new trial.

*Affirmed in part,*
*reversed in part,*
*and remanded.*