Michelle SANDOW–PAJEWSKI, Christine Pajewski, and Dr. Thomas N. Pajewski, Plaintiffs,

v.

BUSCH ENTERTAINMENT CORPORATION, and Jaad Moreno Trading Co., Defendants.

No. 4:98CV00114.

United States District Court, E.D. Virginia, Newport News Division.

July 13, 1999.

Andrew Michael Sacks, Stanley E. Sacks, Sacks & Sacks, Norfolk, VA, for Plaintiffs.

Lisa Ann Bertini, Hofheimer Nusbaum, P.C., Norfolk, VA, William Franklin Devine, Hofheimer Nusbaum, P.C., Norfolk, VA, Fay Frances Spence, Spence & Whitlow, Norfolk, VA, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT

BRADBERRY, United States Magistrate Judge.

Plaintiffs instituted this cause of action in federal court against defendants on August 26, 1998. Plaintiffs Michelle Sandow–Pajewski and Christine Pajewski allege that they were injured by a wheelchair patron while they were visiting Busch Gardens in Williamsburg, Virginia. Dr. Thomas N. Pajewski alleges that he is entitled to recover his expenses for curing his daughter, Christine Pajewski's, injuries. Following appropriate discovery, this matter is now before the Court on Busch Entertainment Corporation's (hereinafter "Busch") motion for summary judgment.

## I. STATEMENT OF THE CASE

On August 26, 1996, Michelle Sandow–Pajewski (hereinafter "Sandow–Pajewski") and Christine Pajewski (hereinafter "C. Pajewski"), accompanied by others, went to Busch Gardens for the day. (Compl. ¶ 15.) In the early afternoon, Sandow–Pajewski and C. Pajewski allege they were injured while exiting the Wild Moose Lodge at Busch Gardens. (Sandow–Pajewski Dep. at 17.) The Wild Moose Lodge is designed to look like a log cabin, and it is a facility that is used "for lost children of guests and for parents to rest, diaper, nurse, etc., with their young children." (Pauls Aff. at 1.) When Sandow–Pajewski and C. Pajewski were exiting the lodge, there was a woman in a motorized wheelchair coming up a ramp which led up to the door of the lodge. (Sandow–Pajewski Dep. at 17–18.) The woman operating the wheelchair was "a heavy ... woman," and she was accompanied by a young man who was between ten and fourteen years old. (Sandow–Pajewski Dep. at 18, 40.) As Sandow–Pajewski and her daughter were exiting the lodge, the wheelchair patron appeared to be stuck on the ramp. The wheelchair was making "a revving sound," and the young man was encouraging the woman to go forward with her wheelchair. Sandow–Pajewski testified that "before I could react or do anything, the wheelchair, which was stuck on the right-hand side of a ramp, bolted free and hit me." (Sandow–Pajewski Dep. at 18.) The wheelchair knocked Sandow–Pajewski to the floor of the porch, and before she could react or stand up, the wheelchair patron ran over Sandow–Pajewski a second time. (Sandow–Pajewski Aff. at 3; Dep. at 18.) Sandow–Pajewski claims that she suffered severe injuries because of the accident, and she was removed from the area in a wheelchair. (Sandow–Pajewski Aff. at 4.) In the course of the accident, C. Pajewski suffered an abrasion to her right arm, and after a band-aid was placed on her arm at the first-aid station, C. Pajewski's parents were able to treat her injury at home. (Dr. Pajewski's Answers to Busch's First Interrogs ¶ 11.)

The identity of the wheelchair patron has never been determined. All that any-

one knows about her is what Sandow–Pajewski remembers. Sandow–Pajewski described the wheelchair patron as a "heavy . . . woman" who probably weighed "over 200 pounds." (Sandow–Pajewski Dep. at 40, 104.) She had no idea of the woman's age. (Sandow–Pajewski Dep. at 40.)

At the time of the accident, plaintiffs claim that the wheelchair patron was operating a motorized wheelchair that she had rented while at Busch Gardens. (Compl. ¶¶ 10–11, 18.) In support of this claim, Sandow–Pajewski stated that it was a scooter-like wheelchair which had a Busch Garden's sticker on its lower side. (Sandow–Pajewski Dep. at 47.) She believes that the sticker was rectangular in shape and that it was blue and white. (Sandow–Pajewski Dep. at 88.) Sandow–Pajewski does not remember whether the wheelchair had a basket on it, what the color of the wheelchair was, or whether it bore any numbers. (Sandow–Pajewski Dep. at 47.) She has no personal knowledge as to whether the wheelchair belonged to the woman or whether the woman rented the chair at the park. (Sandow–Pajewski Dep. at 90.) Sandow–Pajewski also admitted that she had no knowledge of whether the wheelchair patron was instructed by anyone regarding the use of the chair. (Sandow–Pajewski Dep. at 77.)

In support of their brief in opposition to Busch's motion for summary judgment, plaintiffs submitted affidavits from Wendy Sandow and Steve Gleason. Both Sandow and Gleason went to Busch Gardens with Sandow–Pajewski and C. Pajewski on August 26, 1996. These individuals were located outside of the Moose Lodge, and they did not see the accident occur, but they heard it, and they immediately ran over to Sandow–Pajewski after she was thrown to the ground. (Sandow Aff. at 2; Gleason Aff. at 2.) Sandow and Gleason have stated that they observed the ramp after the accident, and they concluded that it was "virtually impossible for any wheelchair to be safely maneuvered up and down that ramp because of its narrowness and configuration, and a motorized wheelchair could, in no way, properly and safely use that ramp." (Sandow Aff. at 2; Gleason Aff. at 2.) Following the accident, Sandow–Pajewski was placed in a wheelchair, and both Sandow and Gleason reported that Busch Garden employees tried to take the wheelchair down the ramp, but they were unable to do so "because of its narrowness and configuration," and as a result, Sandow–Pajewski's wheelchair had to be picked up in order to get her to ground level. (Sandow Aff. at 2; Gleason Aff. at 2.) In an affidavit submitted to the Court, Sandow–Pajewski expressed her opinion that she did not believe that the ramp was designed for wheelchairs and that the ramp was unable to safely accommodate any type of wheelchair. (Sandow–Pajewski Aff. at 2.) Sandow–Pajewski also stated her conclusion that it was obvious that the wheelchair patron "was incompetent to operate the wheelchair properly." (Sandow–Pajewski Aff. at 3.)

Plaintiffs allege that Busch was negligent in that it failed to maintain "a safe and secure premises," allowing "dangerous, defective, and hazardous conditions to exist" of which Busch knew or should have known. (Compl. ¶ 17.) First, plaintiffs allege a negligent design claim, stating that Busch allowed a wheelchair patron to operate a wheelchair on a ramp that did not have "a safe or adequate design of ingress and egress to permit the safe passage of such wheelchairs in close proximity to patrons." (Compl. ¶ 18.) Second, plaintiffs allege that Busch failed to properly warn non-wheelchair patrons in the park about the "imminent presence of wheelchair-bound patrons." (Compl. ¶ 18.) Finally, plaintiffs allege a negligent entrustment claim against Busch, stating that it failed "to monitor and supervise the use of wheelchair equipment on its premises in such a manner as to allow the safe usage of such equipment without presenting risks of danger to other patrons." (Compl. ¶ 18.)

The complaint contains additional claims against Jaad Moreno Trading Company, also resulting in a motion for summary judgment.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Motion for Summary Judgment Standard

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, the pleadings, or other evidence, that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party is not entitled to summary judgment if the dispute about a material fact is "genuine." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of fact exists if a reasonable jury could return a verdict for a nonmoving party. *See id.* In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict. *See id.*

Finally,

We must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove.

*Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992).

### B. Busch is Entitled to Summary Judgment on all Claims.

■ Plaintiffs have brought negligence claims against Busch for improper design of a ramp, failure to warn walking patrons of the presence of wheelchair patrons, and negligent entrustment of a motorized wheelchair. While there is no question that Sandow–Pajewski was injured during her visit to Busch Gardens in 1996, the mere fact of her injury does not permit the trier of fact to conclude that Busch was negligent and therefore, is liable to plaintiffs. Such an inferential leap would require the Court to apply the doctrine of *res ipsa loquitur* to circumstances which clearly fall short of entitlement to the presumption.

The literal meaning of *res ipsa loquitur* is "[t]he thing speaks for itself." *Black's Law Dictionary* 1305 (6th ed.1990). In the realm of torts, it simply means that negligence is self-evident from the act causing injury or harm. Application of the doctrine is infrequent and generally involves conduct that is obviously negligent, e.g. the failure to remove a large surgical sponge following abdominal surgery, *see Easterling v. Walton,* 208 Va. 214, 156 S.E.2d 787 (1967), or the infliction of a burn on a newborn infant via an overheated water bottle, *see Danville Community Hosp. v. Thompson,* 186 Va. 746, 43 S.E.2d 882 (1947). However, the doctrine has been significantly limited in Virginia. *See Lewis v. Carpenter Co.,* 252 Va. 296, 477 S.E.2d 492, 494 (1996). The court in *Lewis* stated:

The restricted nature of the doctrine is implicit in a statement of its elements. For the doctrine to apply, the instrumentality causing the damage must be in the exclusive possession of or under the exclusive management of the defen-

dant, the accident must be of such nature and character as does not ordinarily occur if due care is used, and the evidence regarding the cause of the incident is accessible to the defendant and inaccessible to the injured party.

In other words, the mere fact that an accident occurred does not warrant application of the doctrine. It may be utilized only when the circumstances of the incident, without further proof, are such that, in the ordinary course of events, the incident could not have happened except on the theory of negligence. In such case, the doctrine raises a presumption or permits an inference of negligence. It is not to be applied, however, when evidence is available.

Moreover, the doctrine never applies in the case of an unexplained accident that may have been attributable to one of two causes, for one of which the defendant is not responsible.

*Id.* at 494 (citations omitted); *see also May v. Dover Elevator Co.*, No. 94–1377, 1994 WL 656034 (4th Cir. Sept.27, 1994) (unpublished table opinion at 40 F.3d 1244); *Cooper v. Horn*, 248 Va. 417, 448 S.E.2d 403 (1994). Plaintiffs are not entitled to the benefits of the doctrine under the facts of this case.

### 1. *Negligent design claim*

▮ Plaintiffs claim that the ramp outside of the Moose Lodge was not properly designed to allow the safe passage of wheelchairs and patrons up and down the ramp. (Compl.¶ 18.) There is, however, no basis for liability on the negligent design claim. Under Virginia law, the owner of a premises is not an insurer of his invitees' safety. Rather, the owner must use ordinary care to render the premises reasonably safe for an invitee's visit. *See Franconia Associates v. Clark*, 250 Va. 444, 463 S.E.2d 670, 672 (1995); *see also* cases cited therein. Further, in order to hold the owner of property liable for injuries sustained by an invitee due to the unsafe condition of the premises, it must

be shown that the owner had knowledge of the alleged unsafe condition, or that it had existed for such a length of time as to make it the owner's duty in the exercise of ordinary care to have discovered it. *See Cannon v. Clarke*, 209 Va. 708, 167 S.E.2d 352, 355 (1969); *see also Rodgers v. Food Lion, Inc.*, No. 95–2815, 1996 WL 673802, at *1 (4th Cir. Nov.22, 1996) (unpublished table opinion at 103 F.3d 119); *Kellam v. Wal–Mart Stores, Inc.*, 843 F.Supp. 1074, 1075 (E.D.Va.1994); *Ashby v. Faison*, 247 Va. 166, 440 S.E.2d 603, 605 (1994); *Grim v. Rahe, Inc.*, 246 Va. 239, 434 S.E.2d 888, 889–90 (1993); *Winn-Dixie Stores, Inc. v. Parker*, 240 Va. 180, 396 S.E.2d 649, 650 (1990).

In order to show that there was a defect in the design of the ramp outside the Moose Lodge, plaintiffs would have to provide expert testimony to support their claim. *See Kesler v. Crown Equip. Corp.*, No. 93–0644–R, 1994 WL 782904, at *2 (W.D.Va. July 5, 1994), *aff'd*, 51 F.3d 266 (4th Cir.1995) (finding that except when there is an established norm, the court is required to rely on expert testimony to determine what the safety standard is in a design defect case); *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993) (requiring expert testimony to determine what safety standards applied to a case); *Nelson v. Commonwealth*, 235 Va. 228, 368 S.E.2d 239, 245 (1988) (stating that the "standard of care properly should have been the subject of expert testimony because the trier of fact is not permitted to speculate as to the professional standard against which to measure the reasonableness" of defendant's actions or inaction). An expert is allowed to testify where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The testimony provided by the expert can be based on "facts or data ... perceived by or made known to the expert at or before the hearing." Fed.R.Evid. 703; *see also Leupen v. Keller Indus., Inc.*, No. 88–2098,

1989 WL 87639, at *2 (4th Cir. July 31, 1989) (unpublished table opinion at 881 F.2d 1069).

■ The Supreme Court of the United States requires that in order for expert testimony to be admitted it must be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) *see also Kumho Tire Co., Ltd. v. Carmichael*, — U.S. —, 119 S.Ct. 1167, 1173–76, 143 L.Ed.2d 238 (1999). Because the trial judge is the gatekeeper for screening expert testimony, he must determine at the outset whether certain expert testimony is admissible. *See Daubert*, 509 U.S. at 592, 113 S.Ct. 2786; *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). In upholding a district court decision, Justice Rehnquist stated the following:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General*, 118 S.Ct. at 516. Black's Law Dictionary defines "ipse dixit" as "[h]e himself said it; a bare assertion resting on the authority of an individual." Black's Law Dictionary 828 (6th ed.1990).

Plaintiffs' mandatory disclosure deadline, as established in the initial pretrial conference order, has passed, and plaintiffs have failed to identify any experts who would testify at trial regarding the defective design of the ramp outside the Moose Lodge. At the hearing on June 8, 1999, plaintiffs' counsel never stated that he planned on calling any experts to testify at trial regarding the negligent construction of the ramp, but instead, plaintiffs' counsel stated that he planned to call Sandow–Pajewski, Sandow, and Gleason to provide testimony regarding the negligent

construction of the ramp. Plaintiffs' counsel argued that the opinions of these three individuals are admissible under Federal Rule of Evidence 701, and when called to testify, these three lay witnesses would provide testimony similar to that which they provided in their affidavits. In her affidavit, Sandow–Pajewski stated that the ramp "is not designed for wheelchairs, either motorized or otherwise. It cannot safely accommodate motorized wheelchairs or, indeed, any wheelchair." (Sandow–Pajewski Aff. at 2.) The affidavits of both Sandow and Gleason contain the following statements:

> I had a good opportunity to observe the ramp and the scene of the accident. In view of what had happened ... I made it a point to observe the accident scene and the ramp and it was clear to me that the ramp could not safely accommodate a motorized wheelchair. It was virtually impossible for any wheelchair to be safely maneuvered up and down that ramp because of its narrowness and configuration, and a motorized wheelchair could, in no way, properly and safely use that ramp.... Further, if such a wheelchair ever successfully navigated the upward incline of the ramp and the abrupt turn to proceed onto the level of the porch, it could very easily be a danger to any children and adults who might be standing or walking on that porch.... The Management of the Park should have communicated to the public that the ramp was dangerous for such a wheelchair and that no-one should attempt to take such a chair up the ramp.

(Sandow Aff. at 2–3; Gleason Aff. at 2–3.) Busch has objected to these lay witnesses being able to offer such testimony at trial.

It is true that Federal Rule of Evidence 701 permits opinion testimony to be provided by lay witnesses in certain situations. When a person is a lay witness, not an expert witness, his opinion testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a

clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701. In this case, the Court would not allow lay witnesses to give opinion testimony about negligent design features of the ramp in question because they have no reliable basis for their opinions. Neither Sandow–Pajewski, Sandow, nor Gleason have established any foundation for their testimony. They opine that the design is faulty because an accident occurred. Unfortunately for Sandow–Pajewski, neither she nor her witnesses are permitted to reason backwards from the point of the accident to the cause. Further, their testimony is completely rebutted by the photographs of the ramp and landing area, offered by Busch and the affidavit of their safety director.

Busch has submitted the affidavit of Mark A. Pauls who is the director of safety and environment at Busch Gardens. In his affidavit, Pauls stated that the motorized wheelchairs which are rented at Busch Gardens are 24½ inches wide at their widest point. (Pauls Aff. at 2.) Attached to his affidavit is a survey of the ramp which shows that the ramp is 54.36 inches wide and that the level landing on the ramp is 63.6 inches wide by 109.8 inches long. (Pauls Aff., Attach. 2.) The guidelines provided in the Americans With Disabilities Act state that a wheelchair ramp can be as narrow as 32 inches at any point, can be continuously as narrow as 36 inches, and if there is a change of direction on the ramp, the level landing must be at least 60 inches by 60 inches. *See* 36 C.F.R. Pt. 1191, App. A, 4.2.1. The ramp and landing outside the Moose Lodge both substantially exceeded all of the requirements set forth in the ADA.

Mere compliance with standards does not relieve Busch of responsibility. After all, standards, as set forth in the ADA, represent minimums, not absolutes. Nor does the fact that Busch chose to build the platform in such a way as to significantly exceed the design minimums mean Busch is not negligent. It is, after all, to Busch's advantage to facilitate the movement of the public in and about the activities, buildings, and places at Busch Gardens. What unrebutted evidence of significant compliance with applicable ADA standards does do is make more obvious the fact that plaintiffs may not rely upon their own subjective opinions, together with those of their friends, to support their negligent design claim.

The Court has viewed the pictures of the ramp and the size of the motorized wheelchairs rented at Busch Gardens relative to the dimensions of the ramp. There is ample room for the conveyances to pass one another, to change directions safely, and to share the space with pedestrians. In the absence of expert testimony, plaintiffs are left without evidence to support this claim.

### 2. Failure to warn claim

Plaintiffs state that Busch was negligent in that it "did wrongfully, negligently, and carelessly fail to properly warn non-wheelchair using patrons such as PLAINTIFFS of the imminent presence of wheelchair-bound patrons." (Compl.¶ 18.) When asked about this claim at the hearing on June 8, 1999, plaintiffs' attorney stated that he is no longer urging this claim. The claim should not have been brought. Wheelchairs of every type, self-propelled and otherwise, are common-place in society. It is not possible to move about in our world, whether in the workplace, school, industry, government endeavors, recreational sites, malls, churches, or public transportation, without seeing individuals enjoying the mobility wheelchairs afford. It is simply not necessary, or required, to notify people of the obvious, particularly when the subject of the warning may be easily detected, using only the most minimal efforts of observation. This claim has never had any merit.

### 3. Negligent entrustment claim

■ Plaintiffs allege that Busch was negligent because it failed "to monitor and

supervise the use of wheelchair equipment on its premises in such a manner as to allow the safe usage of such equipment without presenting risks of danger to other patrons." (Compl.¶ 18.) Jaad is responsible for renting wheelchairs and strollers at Busch Gardens, but plaintiffs contend that Busch was negligent because it failed to properly supervise the work that Jaad did when renting such equipment. (Compl.¶¶ 11, 18.) Despite what plaintiffs have alleged, there is no basis for liability against Busch on a negligent entrustment claim.

### a. Whose motorized wheelchair was the patron driving when she hit Sandow–Pajewski?

In order to maintain a claim for negligent entrustment, the first thing that plaintiffs must prove is that the motorized wheelchair which struck Sandow–Pajewski was actually rented by Jaad at Busch Gardens. However, there is little evidence to support this conclusion. Neither side has been able to locate the patron who was driving the wheelchair when it hit Sandow–Pajewski, and as a result, it has been impossible to ask the patron where she got the wheelchair. It is unfortunate that neither of plaintiff's friends was able to follow the wheelchair operator and learn her identity. Subsequent efforts to locate her in the park were also unsuccessful. How do you lose a two-hundred pound woman in a motorized wheelchair in a contained setting such as Busch Gardens? Nevertheless, that is what happened.

All the Court has before it is Sandow–Pajewski's statements. Sandow–Pajewski stated that she saw a Busch Gardens sticker on the bottom of the side of the wheelchair, and she stated that the shape of the sticker was a rectangle. (Sandow–Pajewski Dep. at 47, 88.) She also stated that it looked like a bumper sticker, but it was smaller, and the sticker was white and blue. (Sandow–Pajewski Dep. at 88.) Sandow–Pajewski did not, at one point, remember what color the wheelchair was,

if it had a basket, or if it had numbers on it. (Sandow–Pajewski Dep. at 47, 90.) There is no testimony before the Court regarding what type, if any, identification Jaad placed on the wheelchairs that it rented at Busch Gardens. There is simply no way to know whether the wheelchair patron rented the chair within the park or whether she brought her own wheelchair into the park and placed a Busch Garden's sticker on it. However, this is but one of the problems which plaintiffs have with their negligent entrustment claim.

### b. Should defendants have known of any condition which the wheelchair patron had which made her incompetent and incapable of properly operating the wheelchair?

Even if plaintiffs were able to show that the wheelchair was rented at Busch Gardens, there is no evidence to establish that Busch knew "or had reasonable cause to know" that it was entrusting the wheelchair to "an unfit driver likely to cause injury to others." *Denby v. Davis*, 212 Va. 836, 188 S.E.2d 226, 229 (1972); *see also Kingrey v. Hill*, 245 Va. 76, 425 S.E.2d 798, 799 (1993). There is no evidence that shows the wheelchair patron who hit Sandow–Pajewski had a condition or characteristic that made her an incompetent operator. In addition, and more importantly, there is no evidence that the wheelchair patron had a condition which defendants should have known about when the wheelchair was rented to her. Without such evidence, plaintiffs cannot establish a negligent entrustment claim.

All the Court knows about the wheelchair patron is what it has heard from Sandow–Pajewski: that the operator was a large woman, probably weighing in excess of 200 pounds, and of an indeterminable age. There is not a scintilla of evidence to establish any problems which the wheelchair patron had which made her incapable of operating the chair. Instead, plaintiffs are reasoning backwards from the accident, saying that because there was an accident in which plaintiffs were injured,

the wheelchair patron must have been incompetent to operate the chair. In the formal world of logic, the method adopted by plaintiffs produces a false syllogism. Plaintiffs argue that the occurrence of the accident supports the conclusion that the operator was incompetent. The logic excludes other hypotheses: that the wheelchair operator was affected by the negligent acts of an unknown third party; the operator experienced a physical problem, e.g. suffering dirt in her eye; 'or the wheelchair controls malfunctioned. Each explanation is as plausible as the next, and each requires the Court to speculate. In the face of total uncertainty about causation, the claim cannot proceed past summary judgment.

### c. Did defendants fail to properly instruct the wheelchair patron when she rented the chair?

Here, the Court must return to the fact that nobody knows who was operating the wheelchair that hit Sandow–Pajewski. Without knowing who the driver of the chair was, it is impossible to know what type of instructions she received when, and if, she rented the chair at Busch Gardens. Plaintiffs admit that they do not know whether the wheelchair patron received any instructions on the use of the wheelchair on August 26, 1996, when the chair was allegedly rented. (Pls.' Br. in Opp'n to Mot. for Summ.J. at 5.) The only evidence advanced by plaintiffs is that when they questioned the head of security, William Carlson, he did not know what instructions were given to people who rented wheelchairs at the park. Carlson's lack of knowledge does not lead, inescapably, to deficient instructions. Again, such a conclusion would be based on nothing but pure speculation.

Busch submitted an affidavit from Victoria Semler–Barfield who was the on-site manager for Jaad's wheelchair and stroller concession in 1996.[1] (Semler–Barfield Aff. ¶ 2.) Semler–Barfield stated that in 1996, a Jaad employee would go over a checklist with the guest before the guest was able to rent a wheelchair. (Semler–Barfield Aff. ¶ 5.) The items on the checklist included: (1) how to get in/out of the chair, (2) how to insert/remove the key, (3) the location of the horn, (4) how to go forward, reverse, and stop, (5) how to swivel the chair/arm rest, and (6) instructions that no u-turn should be done on hills or ramps. (Semler–Barfield Aff., Attach. 2.) Once all of the items on the list had been reviewed, the patron would sign the bottom of the checklist and pay for the rental. (Semler–Barfield Aff. ¶ 7.) The routine procedure for Jaad in 1996, was to review the checklist with each patron and ask each patron if they had any questions about the operation of the wheelchair. (Semler–Barfield Aff. ¶ 8.) Located on the control panel of each wheelchair were also instructions which told: (1) where to insert the key, (2) how to travel forward, how to stop, and how to reverse, (3) the instruction not to back

1. Plaintiffs have filed a motion to exclude Semler–Barfield's affidavit because it was submitted by Busch after the motion hearing. The Court recognizes plaintiffs' objections to the affidavit, but the Court will consider Busch's supplemental submissions. Specifically, the Court finds no merit to plaintiffs' suggestion that the affidavit information is insufficient because Semler–Barfield had no personal knowledge. It would be impossible to have personal knowledge about the renting procedures followed for this particular wheelchair patron because no one knows who the patron was, and accordingly, her rental sheet cannot be pulled, and the employee who handled the rental cannot be located. It is plaintiffs' responsibility to show Jaad's employees did not follow the regular rental procedure in this case, and plaintiffs have provided no such information. The Court must also remind plaintiffs that at the hearing, the Court looked at photographs of wheelchairs provided by plaintiffs' counsel which had not been previously presented to the Court or to defense counsel before the time of the hearing. All that Busch had done is submit information in response to inquiries made by the Court during the hearing. In addition, even if the Court was not to review this data provided by Busch, the Court would still grant the motion for summary judgment because plaintiffs have failed to provide any evidence to support their claim that the wheelchair patron was negligently instructed.

down inclines, (4) the instruction to stop before changing directions, and (5) the instruction not to carry passengers. (Semler–Barfield Aff., Attach. 3.) There have been no facts presented to the Court by plaintiffs ·which show that faulty instructions were given to individuals who rented wheelchairs at Busch Gardens in 1996.

### d. Can Busch be responsible for injuries caused by Jaad's alleged negligence?

■ On February 1, 1996, Busch entered into a license agreement with Jaad through which Jaad was to operate a stroller and wheelchair rental concession at Busch Gardens. (Def.'s Mem. in Support of Summ.J., Ex. F.) Busch maintains that Jaad was an independent contractor and that it cannot be held responsible for any negligence of Jaad in entrusting wheelchairs to incompetent patrons. Specifically, Busch points to section 10.6 of the license agreement which states that it "is the intent of both parties ·that this Agreement shall be construed as a mere license to do business in the Park, upon the terms, conditions, and provisions contained in this Agreement, and nothing in this Agreement shall be construed as creating any relationship of landlord and tenant, principal and agent, partnership · or joint venture between the parties." (Def.'s Mem. in Support of Summ.J., Ex. F.) The Court is well aware that just because the agreement says that a principal and agent relationship has not been created does not automatically make that so. However, plaintiffs have not put forth ·any evidence to show that Jaad is anything but an independent contractor. In addition, plaintiffs have not advanced any arguments nor offered any evidence to justify an exception to the general rule excluding liability for the actions of an independent contractor.

### 4. Dr. Pajewski's Claim

■ Dr. Pajewski prays for a judgment award in the amount of Ten Thousand Dollars ($10,000.00) for compensatory damages. (Compl.¶ 26(D).) There is no evidence to support such recovery by Dr. Pajewski.

In Dr. Pajewski's answers to Busch's first interrogatories, he stated that his daughter had fallen and injured her right arm, and he stated that after getting a band-aid at the first aid station, she was treated at home by her parents. (Dr. Pajewski's Answers to Busch's First Interrog. ¶¶ 8, 11.) As a result of the fall, C. Pajewski sustained an abrasion to her right arm, but she had no permanent injury or continuing symptoms or complaints. (Dr. Pajewski's Answers to Busch's First Interrog. ¶¶ 10, 12.) In her deposition, Sandow–Pajewski stated that her daughter did not have to see a doctor for her injury and that she does not have any permanent injury as a result of the accident. (Sandow–Pajewski Dep. at 76.) In his deposition, .Dr. Pajewski admitted that his daughter had had no medical bills as a result of the accident, and she has not complained about her elbow to her parents since the accident. (Dr. Pajewski Dep. at 13.) Dr. Pajewski stated that his daughter "was obviously quite disturbed for a period of time" after the accident but that she has not had to seek any psychological care, and he did not expect her to have to see a psychologist in the future. (Dr. Pajewski Dep. at 15–16.) In fact, Dr. Pajewski agreed with defendant's counsel when she stated that it seemed that his daughter had gotten better. (Dr. Pajewski Dep. at 16.)

There is no doubt that if Busch's negligence caused C. Pajewski to be injured, then her father, Dr. Pajewski, would, in his representative capacity, be able to recover expenses from Busch for the care and cure of C. Pajewski's injuries. Such a right of recovery is assured to parents under section 8.01–36 of the Virginia Code. However, there have been no expenses incurred in the past or that are foreseeable in the future for "curing and attempting to cure" the injuries and damage that C. Pajewski suffered because of her fall. Putting aside the fact that plaintiffs have not been able

to show that Busch's negligence caused the injuries, plaintiffs are also unable to show any expenses incurred for the treatment of C. Pajewski, as a result of the accident. Accordingly, the claim must be DISMISSED.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Busch's motion for summary judgment and DIRECTS the Clerk to enter judgment in favor of Busch and against plaintiffs.